## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JOHN HALVONIK,

                        Plaintiff,

            v.

                                        Civil Action
JON W. DUDAS,                           No. 99-863
Under Secretary of Commerce
for Intellectual Property
and Director of the United
States Patent and Trademark
Office

                        Defendant.

## MEMORANDUM OPINION

In this case, the Court is asked to review the seven month suspension of John P. Halvonik ("Halvonik") from the Patent and Trademark Office ("PTO"). In proceedings below, the PTO charged Halvonik with three counts of misconduct. An Administrative Law Judge ("ALJ") found Halvonik guilty of certain charges contained in two counts, but dismissed one count as barred by the statute of limitations. Much of the ALJ's decision was affirmed on appeal to the Commissioner of the PTO ("Commissioner"). Thereafter, Halvonik sought judicial review by this Court claiming that the PTO had (1) violated its own rules, (2) did not accord him due process, and (3) misapplied the law. This matter is now before the Court on the parties' Cross-Motions for Summary Judgment. The Court affirms the

PTO's decision.  The Petitioner's Motion for Summary Judgment is **denied** and the Respondent's Motion for Summary Judgment is **granted**.

## BACKGROUND[1]

Halvonik graduated from Allegheny College with a Bachelor of Science in Chemistry and attended American University Law School ("American"). Halvonik Tr., Nov. 13, 1997 ("Halvonik Transcript"), PTO 02121, PTO 02121 (p. 958).[2]  While at American, Halvonik pursued an interest in patent law, id. at PTO 02121-22 (pp. 959-60), and worked at law firms where he conducted patent searches. Id.  In 1987, while still a student at American, Halvonik took and passed the Patent Bar. Id. at PTO 02122 (p. 962).  The following May, Halvonik graduated from American.  Id.  Thereafter, he became licensed before the PTO and took and passed the Pennsylvania State Bar exam.[3]  Id.

---

[1]Pursuant to Local Civil Rule 7.1(h), "[i]n determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." Furthermore, because this case involves an administrative appeal, the Court relies on the evidence contained in the Administrative Record.

[2]The record in this case has been given bates numbers in the form PTO ____.  Because the ALJ and Commissioner relied on the page numbers of the document themselves, those page numbers are included in parentheses following the bates number.

[3]To the best of the Court's knowledge, Halvonik is still a member in good standing of the Pennsylvania State Bar and is licensed to practice before the PTO.

Following his graduation, and during and after his completion of the Pennsylvania Bar exam, Halvonik worked as an independent patent searcher for law firms.  Id. at PTO 02122 (p. 961-62).  His practice gradually grew into an independent practice with its own, non-legal, clientele.  Id.  However, throughout his legal practice Halvonik never worked as an associate employee of a law firm, id. at PTO 02122 (p. 965), or associated himself with a more senior attorney, id. at PTO 02123 (p. 966).  Rather, he started off by "hanging out a shingle" and putting ads in the Yellow Pages and magazines that he was available for patent work.  Id.

In his practice, Halvonik's business model catered to "small, independent inventors," to whom he would offer "[t]imely, efficient patent services" focusing on the drafting of patent applications.  Id. at PTO 02123 (pp. 967-68).  Additionally, he sought to attract clients with flat fees, at rates lower than the hourly rates offered by competing firms.  Id. at PTO 02123 (pp. 968-69).  As the Administrative Law Judge recounted, Halvonik:

> [W]as a relatively new practitioner who hung his shingle out with little guidance from a more seasoned practitioner.  By doing so, he received significant economic benefits . . . .  [His] marketing strategy of undercutting his competition generated 250-275 client actions per year.  Essentially such amounts to over one action per day. . . .  The undersigned's impression is not that [Halvonik] is an inattentive practitioner, but rather one who undertook more than he could reasonably handle and as a result his practice began to resemble that of the 'little Dutch boy' running to put his finger wherever the dike was leaking.

Initial Decision in <u>Bovard v. Halvonik</u>, ("<u>Initial Decision</u>"), PTO 00973, PTO 01039-40 (pp. 59-60).

As the ALJ's Decision implies, Halvonik's relative inexperience, combined with an increasing work-load, eventually had consequences. As a result, starting in 1990, the PTO began to receive complaints regarding Halvonik's work and conduct. <u>See</u> Joint Stipulation of Facts in <u>Initial Decision</u>, PTO 00973, PTO 00993 (p. 21) at ¶ 11. The first complaint was brought by "individual inventor" Robert Marcon ("Marcon"). <u>Id.</u>[4] Marcon had retained Halvonik to search the validity of a patent. <u>Id.</u> at ¶ 3. Although Halvonik estimated that the search would take four weeks, Halvonik (a) did not provide a final report until ten months later, (b) repeatedly gave assurances of when he would provide a finished report, but (c) never honored those assurances. <u>Id.</u> at ¶¶ 4-9. During the course of their relationship, Marcon wrote to the PTO in December 1990 complaining about Halvonik, "particularly in regard to the delay in receiving the formal report and what he perceived to be Halvonik's lack of responsiveness to his telephone inquiries." <u>Id.</u> at ¶ 11. The PTO notified Halvonik of Marcon's complaint and invited him to respond. <u>Id.</u> at PTO 00994 (p. 22) at ¶ 12. After receiving Halvonik's response, on November 4, 1992, the Director of Enrollment and Discipline advised Halvonik by

_____

[4]Although part of the original Complaint against Halvonik, the ALJ found that this charge was barred by the statute of limitations. <u>Initial Decision</u>, PTO 00973, PTO 00992 (p. 20).

letter that:

> I have decided not to present this case to the Committee
> on Discipline at this time, but to give you the
> opportunity under 5 U.S.C. § 558(c) to come into
> compliance with the rules and regulations of the PTO.
> Accordingly, this investigation is terminated at this
> time. However, this matter will be considered in dealing
> with any further complaint or evidence of misconduct
> which may come to the attention of the office in the
> future.

*Id.* at ¶ 13. Unfortunately for Halvonik, the PTO received

additional complaints from two of Halvonik's other clients. These

complaints, from Jack Rick Nelson ("Nelson"), *id.* at PTO 00995 (p.

23) at ¶ 32, and Diane Palmer ("Palmer"), *id.* at PTO 00996 (p. 24)

at ¶ 48, provide the basis for this case.


A. APPLICATION ON BEHALF OF NELSON:

    In August 1992, Nelson retained Halvonik to prepare and file

a patent application for his invention of "a molding strip to be

used in replacing automobile windows." *Id.* at PTO 00994 (p. 22) at

¶ 15. During the course of their relationship, Halvonik would send

drafts of the application to which Nelson would proffer

suggestions. *Initial Decision*, PTO 00973, PTO 01038 (p. 58).

However, by the third iteration of this process, Halvonik still had

not begun to make many of Nelson's suggested revisions despite the

fact that, in the ALJ's words, Halvonik "was effectively being

spoon-fed by his own client and should have grasped and made the

requested changes and likewise should have included a preferred

embodiment and a descriptive disclosure . . . ." *Id.* The ALJ

found that during a telephone call on October 21, 1992, Halvonik
had promised to make specific "changes and additions" and "asked
Nelson to sign . . . the necessary paperwork to file the
application . . . ." Id. at PTO 01038-39 (pp. 58-59). Based on
the assurances that Halvonik would make the agreed upon revisions,
Nelson signed the paperwork necessary to file the application even
though he knew the application, in its then present form, to be
incomplete. Id. at PTO 01005-06 (pp. 32-33). The next day, Nelson
sent Halvonik the signed Patent Declaration and the $355.00 filing
fee. Joint Stipulation of Facts in Initial Decision, PTO 00973,
PTO 00994 (p. 22) at ¶ 22. On October 29, 1992, Halvonik filed the
application with the PTO without the agreed upon revisions. Id. at
¶ 23; Initial Decision, PTO 00973, PTO 01040 (p. 60). The ALJ
found that, "[a]s a result of his lack of follow-through and
failure to carefully scrutinize that which he was about to file,
[Halvonik] filed an application which did not conform to the
inventor's intentions, which had been clearly expressed to him on
several occasions prior to the time Nelson signed the declaration."
Initial Decision, PTO 00973, PTO 01040 (p. 60). Nelson did admit
that he asked Halvonik to file the application "as soon as
possible" early in his relationship with Halvonik, id. at PTO 01004
(p. 32), and never communicated anything to the contrary
thereafter. Id. Nevertheless, the ALJ found that Nelson had not
put "a significant degree of pressure on [Halvonik]" to justify the

misfiling of his application.  Initial Decision, PTO 00973, PTO

01040 (p. 60).

Following the filing of the application, Nelson inquired

regarding the final filing Halvonik made on his behalf.  Joint

Stipulation of Facts in Initial Decision, PTO 00973, PTO 00995 (p.

23) at ¶ 24.  In November, Halvonik sent Nelson a copy of the draft

application without any of the agreed upon revisions.  Final

Decision in Bovard v. Halvonik, ("Final Decision"), PTO 02568, PTO

02571 (p. 4).  Thinking that Halvonik had mistakenly sent him the

wrong version, Nelson phoned Halvonik attempting to determine which

version had been filed.  Id.  Although Halvonik received the PTO

filing receipt sometime in December 1992, he did not review the

application file until late January 1993, or notify Nelson that he

received the filing receipt.  Id.  In early February, Halvonik

advised Nelson that he had "screwed-up" in that he filed the

application without the agreed upon revisions, id., and that an

"Office Action"[5] had been issued by the PTO regarding the

application.  Joint Stipulation of Facts in Initial Decision, PTO

00973, PTO 00995 (p. 23) at ¶ 25.  The following day Nelson

discharged Halvonik and subsequently retained new counsel, id. at

¶ 26, to whom he paid $2,500 to handle his application, Initial

---

[5]After an initial analysis of a patent application, the PTO
communicates to the filer any of its objections to, or rejection
of, the application.  See Herbert F. Schwartz, Patent Law &
Practice 15-16 (1995); see also  35 U.S.C. § 132(a) (2000).  This
notification is termed an "office action."

Decision, PTO 00973, PTO 01041 (p. 61) n.12.  On February 19, 1993
Nelson filed a complaint with the PTO regarding Halvonik.  The PTO
charged  Halvonik  with  violating  six  disciplinary  rules  in
connection  with  Nelson's  application,  Compl., PTO 00007, PTO
00014-15 (pp. 8-9) at ¶ 50.

B. APPLICATION ON BEHALF OF PALMER:
      In late March 1993, Palmer retained Halvonik to prepare and
file a patent application for a kitty litter box claimed to be
completely waterproof.  Final Decision, PTO 02568, PTO 02571 (p.
4).  Along with a check for $1,300 and the necessary disclosure
forms, Palmer sent her invention to Halvonik.  Id. at PTO 02571-72
(pp. 4-5).  A month later, Halvonik sent Palmer a draft of a patent
application with at least four errors.  Id. at PTO 02572 (p. 5).
According to the ALJ, the "initial draft of the Palmer application
did not measure up to [Halvonik's] own nor the expert's standard
for what is an acceptable first draft . . . ."  Findings of Fact in
Initial  Decision,  PTO  00973,  PTO  01065  (p. 85)  at  ¶  19.
Dissatisfied with his draft, Palmer sent Halvonik an eight-page
revision with penciled figures on May 10, 1993.  Id. at ¶ 20; Joint
Stipulation of Facts in Initial Decision, PTO 00973, PTO 00995-96
(p. 23-24) at ¶ 36.  However, upon further reflection, on May 19,
2003, Palmer telephoned Halvonik that she wished to discontinue his
services.  Final Decision, PTO 02568, PTO 02572 (p. 5).  In
response, later that same day, Halvonik faxed Palmer a new draft of

the application which was nearly verbatim of Palmer's revised draft
but still did not contain a claim section.[6] Id.  Still displeased,
Palmer discharged Halvonik and demanded he return a portion of the
fee she had already paid,    Findings of Fact in Initial Decision,
PTO 00973, PTO 01065 (p. 86) at ¶¶ 28-30.   Palmer also sent a
letter the next day confirming Halvonik's discharge and requesting
a complete refund.  Joint Stipulation of Facts in Initial Decision,
PTO 00973, PTO 00996 (p. 24) at ¶ 40.   Palmer followed up with
another letter dated June 12, 1993 demanding the return of the fee
she paid and her disclosure materials.  Id. at ¶ 41.

In late July 1993, Halvonik sent Palmer a $500 check with a
letter explaining:

> I [sic] reference to your recent request for a refund
> of money you paid for a patent application.  I am
> enclosing a check for $500 based on the original filing
> fee paid less my hourly rate ($90) times hours spent on
> the project.

> I feel this is fair as it is based on the time I spent
> writing two drafts of the application as well as time
> on the phone with you in the first week of April and
> second week of May.

> If this is unacceptable please call or write.

Findings of Fact in Initial Decision, PTO 00973, PTO 01066-67 (pp.

---

[6]A claim section is the concluding portion of a patent
application which "particularly and distinctly define[s] the
subject matter that the inventor regards as his or her invention.
The claims set the metes and bounds of the patent owner's
exclusive rights."  Herbert F. Schwartz, Patent Law & Practice 11
(1995); see also id. at 73.

86-87) at ¶ 34.   On July 26, 1993, Palmer advised Halvonik by letter "that she believed the refund should be for more than $500.00." Id. at PTO 01067 (p. 87) at ¶ 35 .  Palmer also retained counsel, attorney Joel Sachs, who sent Halvonik a letter requesting a full refund and a return of her disclosure materials, specified that Palmer would not cash the check until the full amount owed was tendered, id. at  ¶ 36, and further provided that if Halvonik did not tender an additional check for $800.00 the $500.00 check would be returned so that Halvonik could write a check for $1300.00.  Id. Although advised by her new attorney not to cash the check, Palmer did attempt to cash the check in September but discovered that payment on the check had been stopped.  Id. at ¶ 37.

Halvonik never did file an application on behalf of Palmer, and Palmer never received a refund or the return of her materials. Id. at ¶ 37; see also Count Three and Relevant Admissions/Denials in Initial Decision, PTO 01027, PTO 01029 (p. 49) at ¶ 63.  Palmer referred this matter to the PTO which subsequently charged Halvonik with misconduct.  In its Complaint, the PTO charged Halvonik with five violations of the PTO's disciplinary rules with regard to his handling of Palmer's application.  Compl., PTO 00007, PTO 00017 (p. 11) at ¶ 67.

C. PRIOR PROCEEDINGS AND THE ISSUE FOR THIS PROCEEDING:

In its Complaint, the PTO charged Halvonik with misconduct

relating to his handling of Marcon's, Nelson's, and Palmer's applications.  The ALJ dismissed the Marcon count as barred by the statute of limitations.  The ALJ held a trial regarding Nelson's and Palmer's applications, collecting evidence from Nelson, Palmer, and patent law experts produced by both the PTO and Halvonik, as well as testimony by Halvonik himself.  Following this trial the ALJ found Halvonik guilty of certain charges made by the Disciplinary Committee in regard to his handling of both Nelson's and Palmer's applications.  Specifically, with regard to his handling of Nelson's application, the ALJ found Halvonik guilty of: (1) "disreputable or gross misconduct"[7] and "conduct that adversely reflects on the practitioner's fitness to practice before the Office"[8] for his failure to file Nelson's application with the requested changes and for filing the application with errors and omissions, and (2) "[f]ailing to act competently" by "neglect[ing] a legal matter entrusted to"[9] him for his "failure to follow-up on Nelson's application." Initial Decision, PTO 00973, PTO 01041 (p. 61).  In regard to his handling of Palmer's application the ALJ found that he (1) "engaged in gross misconduct," engaged in "conduct that adversely reflects on the practitioner's fitness to practice before the Office," and failed to "[p]romptly pay or

---

[7] 37 C.F.R. § 10.23(a).

[8] 37 C.F.R. § 10.23(b)(6).

[9] 37 C.F.R. § 10.77(c).

deliver to the client as requested by a client the funds, securities, or other properties in the possession of the practitioner which the client is entitled to receive"[10] for Halvonik's failure to return $500 of Palmer's advance payment for his services; and (2) "conduct that adversely reflects on the practitioner's fitness to practice before the Office" and failure to "[p]romptly pay or deliver to the client as requested by a client the funds, securities, or other properties in the possession of the practitioner which the client is entitled to receive" for failing to return Palmer's disclosure materials.  On appeal the Commissioner affirmed these charges adopting much of the reasoning of the ALJ.[11]  Final Decision, PTO 02568, PTO 02569 (p. 2).

Halvonik challenges the PTO's Decision on several grounds. First he alleges that the PTO failed to follow their own rules in charging him and that he was deprived of due process in the ALJ's failure to allow him to examine the members of the Disciplinary Committee to prove that it did not follow PTO rules.  Next, Halvonik alleges that the Complaint did not properly provide him notice of the correct legal standard and that the ALJ found him guilty of charges not specifically stated in the Complaint.  Third,

[10]37 C.F.R. § 10.112(c)(4).

[11]The ALJ also found Halvonik guilty of preparing an inadequate draft application for Palmer, however, the Commissioner did not adopt this conclusion of law.  Final Decision, PTO 02568, PTO 02583-84 (pp. 16-17).

Halvonik argues that his conduct did not violate the disciplinary rules.  Last, Halvonik asserts that the ALJ's Decision was unsupported by substantial evidence.

## STANDARD OF REVIEW

In accordance with the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, the Court reviews an administrative decision to determine if it is supported by substantial evidence, arbitrary or capricious, or otherwise not in accordance with law.  5 U.S.C. § 706(2); see also Klein v. Peterson, 866 F.2d 412, 414 (Fed. Cir. 1989).  This standard of review does not detract from the PTO's burden of proving its charges against Halvonik by "clear and convincing evidence."  See 37 C.F.R. § 10.149 (providing that the "Director shall have the burden of proving his or her case by clear and convincing evidence" in disciplinary proceedings).  Rather, the Court must consider "whether a reasonable mind could have found the evidence of misconduct clear and convincing."  Klein, 866 F.2d at 414.

## I.  Procedural Errors in Initiating Disciplinary Proceedings

Pursuant to PTO regulations, the Commissioner of the PTO appoints a Director of Enrollment and Discipline ("Director"), 37 C.F.R. §10.2(b)(2), "who has the responsibility of investigating allegations of misconduct by members of the bar."  Goldstein v.

Moatz, 364 F.3d 205, 208 (4th Cir. 2004) (citing 37 C.F.R. §
10.2(b)(2), 10.131(a)).[12]      If the Director finds that a
practitioner has violated the PTO Disciplinary Rules, the "Director
shall . . . call a meeting of the Committee on Discipline" which
"shall then determine as specified in Sec. 10.4(b) whether a
disciplinary proceedings shall be instituted." 37 C.F.R. §
10.132(a). Section 10.4(b), in turn, requires that the "Committee
on Discipline shall meet at the request of the Director and after
reviewing evidence presented by the Director shall, by a majority
vote, determine whether there is probable cause to bring charges .
. . against a practitioner." 37 C.F.R. § 10.4(b) (emphasis added).

     Halvonik alleges that the Committee on Discipline
("Committee") did not "meet"[13] as required under Section 10.4(b),
and further alleges that because he was denied the right to examine
the members of the Committee to prove this contention, he was

---

     [12]Congress has delegated plenary authority to the PTO to
develop rules of professional conduct and disciplinary rules for
practice before their office. 35 U.S.C. § 32 (2000); Gerritsen
v. Shirai, 979 F.2d 1524, 1527 n.3 (Fed. Cir. 1992).

     [13]In alleging that the Committee did not "meet," Halvonik
asserts that the Committee never assembled in the same room, at
the same time, to discuss and review the charges against him.
The Court notes that the Committee does have a degree of
discretion in how it "meets." Cf. Nixon v. United States, 506
U.S. 224, 238 (1993) (holding nonjusticiable whether the Senate's
"trial" was sufficient); Auer v. Robbins, 519 U.S. 452, 462
(1997) (noting agency interpretation of its regulations are
entitled to deference so long as those interpretations are not
erroneous); but cf. Keys v. Barnhart, 347 F.3d 990, 993-94 (7th
Cir. 2003) (Posner, J.) ("Probably there is little left of
Auer.").

deprived of due process of law as guaranteed by the Constitution. According to Halvonik, the Committee functions as a "grand jury" insofar as it approves the initiation of quasi-criminal proceedings against the accused.  Therefore, Halvonik claims, because the agency did not follow such important procedures for initiating an action, the charges against him must be dismissed.  The Court disagrees.

Assuming arguendo that the Committee did not "meet" as required  by the PTO's regulations, Halvonik has failed to allege any prejudicial error stemming from this procedural irregularity. See Keys v. Barnhart, 347 F.3d 990, 994 (7th Cir. 2003) (noting that administrative law recognizes the principle of harmless error), Save Our Heritage, Inc. v. FAA, 269 F.3d 49, 61-62 (1st Cir. 2001); cf. Breese v. United States, 226 U.S. 1, 10-11 (1912)(denying a defendant's motion to dismiss because even if the alleged error had occurred during the grand jury proceedings, there was reason to believe the error was non-prejudicial).[14]  In fact,

---

[14]Although Breese involved a criminal proceeding, the Court notes that the standard in this case is less exacting.  See Kingsland v. Dorsey, 338 U.S. 318, 320 (1949) (Jackson, J. dissenting) ("I agree [with the majority] that the privilege of practicing before the Patent Office is one that may and should be withdrawn for professional misconduct. In defense of his privilege it also is true that the lawyer may not demand that conclusiveness of proof or invoke all of the protections assured to an accused by the criminal process."); In re Surrick, 338 F.3d 224, 233 (3rd Cir. 2003) (collecting cases); Romero-Barcelo v. Acevedo-Vila, 275 F. Supp. 2d 177, 195-96 (D.P.R. 2003) (collecting cases).  Nonetheless, if the PTO's conduct accords to the standard for criminal proceedings, there is no question that

in his proceedings before the PTO, Halvonik admitted many of the
facts that formed the basis of the complaint; the ALJ found that
Halvonik had violated the PTO's disciplinary rules and there is no
evidence that any of the members of the Disciplinary Committee
objected to the charges, cf. 3B CHARLES ALAN WRIGHT ET AL., FEDERAL
PRACTICE AND PROCEDURE § 854 at 475 (3rd. 2004) ("Errors in the grand-
jury proceeding may be regarded as harmless if they did not affect
the decision to indict or if has been cured by a petit jury's
verdict.").

    Moreover, any assumption that the Committee did not meet is
belied by the record in this case.  In the proceedings below, the
Director submitted a declaration attesting to there having been a
meeting.  Decl. of Karen Kovard, PTO 005165.  Additionally, the
Director proffered a probable cause finding signed by the members
of the Committee attesting to the fact that a meeting had occurred.
Determination of Probable Cause, PTO 00526, 526-27.  Based on this
evidence, the ALJ properly found that the Committee met.  Had there
been doubt as to whether disciplinary action should have been
initiated against Halvonik, the members of the Committee could have
raised objections to the procedure or the charges (which they did
not) in any of these filings.[15]  See Fiskars, Inc. v. Hunt Mfg. Co.,

─────────────────

it conforms to the due process rights applicable in this
instance.

    [15]The Final Decision correctly noted that the Federal Rules
of Evidence do not apply to administrative proceedings, see Hamdi

221 F.3d 1318, 1322 (Fed. Cir. 2000) (noting the presumption that agencies act in accordance with law); Sanders v. United States Postal Serv., 801 F.2d 1328, 1331 (Fed. Cir. 1986) ("There is a strong presumption in the law that administrative actions are correct and taken in good faith."); cf. Breese v. United States, 226 U.S. 1, 10 (1912) (finding that when it was alleged that a jury foreman had abused his authority, there was ample opportunity for the other grand jurors to object if this were true).

Consequently, Halvonik's constitutional challenge must also fail. Because any error, even if proven, would have been harmless, Halvonik has failed to assert good cause for requiring the members of the Committee to testify as to whether a "meeting" occurred. Generally, agency officials, like judges and jurors, are immune from being called upon to testify concerning their deliberations. Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 420 (1971); Checkosky v. SEC, 23 F.3d 452, 489 (D.C. Cir. 1994) ("Checkosky I")(opinion of Judge Randolph); compare 37 C.F.R. § 10.4(c) (prohibiting members of the Committee from being subpoenaed to testify concerning Committee deliberations) with Fed. R. Crim.

---

v. Rumsfeld, 124 S. Ct. 2633, 2649 (2004); therefore, reliance on the "out of court" statements by the Director and members of the Committee was not improper. This does not necessarily detract from any right Halvonik may have to confront his accusers. 5 U.S.C. § 556(d); Mathews v. Eldridge, 424 U.S. 319, 335 (1976). Rather, the Court must balance the rights of the accused against the efficiency of the administration of justice. The Court notes that Halvonik was afforded the right to cross-examine all the witnesses relating to issues of his substantive guilt.

P. 6(b)(2),(3) (prohibiting disclosure of grand jury deliberations). This is especially true where, as in this case, a party seeks testimony not to prove his actual innocence, but to prove procedural irregularities -- irregularities, that if proven, would not disprove the substantive charges. Cf. Delaware v. Van Arsdall, 475 U.S. 673, 681 (1986) ("The harmless-error doctrine recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence, and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error.") (citations omitted); Carey v. Piphus, 435 U.S. 247, 259 (1978) ("Procedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property."). To hold otherwise would focus disciplinary actions on the conduct of the agency rather than the conduct of actual matters at issue. Consequently, this is not one of the "rarest of cases" where the Court should pierce the veil of secretive agency deliberations. Checkosky I, 23 F.3d at 489 ; but cf. Goldstein, 364 F.3d at 212 (piercing the veil of agency deliberation is appropriate when there is a claim of malicious prosecution).

Accordingly, the Court finds no merit in these objections.

**II. The Complaint Provided Sufficient Notice to Satisfy Due Process**

"It is elementary that any court or administrative agency which has the power to admit attorneys to practice has the authority to disbar or discipline attorneys for unprofessional conduct." Koden v. United States Dep't of Justice, 564 F.2d 228, 233 (7th Cir. 1977); see also Herman v. Dulles, 204 F.2d 715, 716 (D.C. Cir. 1953) ("An administrative agency that has general authority to prescribe its rules of procedure may set standards for determining who may practice before it."). Nevertheless, because the suspension of a practitioner is "of a quasi-criminal nature," In re Ruffalo, 390 U.S. 554, 551 (1968), in which the practitioner may incur "a punishment or penalty," id. at 550, a practitioner facing suspension is "entitled to procedural due process, which includes [the right of] fair notice of the charge," id.; see also United States v. Bliss, 12 App. D.C. 485 (D.C. Cir. 1898). Not only must the practitioner be noticed that charges have been filed against him, In re Ruffalo, 390 U.S. at 551, the agency must also provide reasonable notice of the offense itself, including the required mental state, necessary to constitute a violation of the rules, Marrie v. SEC, 374 F.3d 1196, 1206 (D.C. Cir. 2004); Checkosky v. SEC, 139 F.3d 221 (D.C. Cir. 1998).

Halvonik asserts that the Complaint never alleged that he committed "willful" misconduct (as required by the charges filed against him) and that the ALJ ultimately found him guilty of a

charge that did not appear in the compliant against him.  Because

of these deficiencies, Halvonik asserts, he was deprived of fair

notice.  Consequently, according to Halvonik, the charges against

him should be dismissed.

## 1. The Complaint Did Provide Notice of Willfulness

Pursuant to 5 U.S.C. § 558:

> (c) ....Except in cases of <u>willfulness</u> or those in
> which public health, interest, or safety requires
> otherwise, the withdrawal, suspension, revocation, or
> annulment of a license[16] is lawful only if, before
> the institution of agency proceedings therefor, the
> licensee has been given –
>> (1)notice by the agency in writing of the facts or
>> conduct which may warrant the action; and
>> (2)opportunity to demonstrate or achieve
>> compliance with all lawful requirements.

(emphasis added).  In this case, the PTO did not provide Halvonik

an "opportunity to demonstrate or achieve compliance with all

lawful requirements." See <u>Initial Decision</u>, PTO 00973, PTO 00989.[17]

Therefore, to permissibly sanction Halvonik, the PTO must

demonstrate that Halvonik committed "willful" misconduct.  The

PTO's Complaint charged Halvonik with "knowingly" committing

violations of the PTO's disciplinary rules which included offenses

---

[16]The permission to practice before the PTO can properly be
considered a "license." See <u>Wolff v. McDonnell</u>, 418 U.S. 539,
558 (1974) (citing <u>In re Ruffalo</u>, 390 U.S. 544 (1968)).

[17]Although the ALJ conceded this point, the Court does note
that on November 2, 1992, the Director sent Halvonik a letter
warning that although no charges were going to be filed, he was
duly warned pursuant to 5 U.S.C. § 558(c) that his conduct must
"come into compliance with the rules and regulations of the PTO."

for "neglect," "incompetence," and "gross misconduct," but never used the term "willful." Complaint, PRO0001 at PTO00014, PTO00017. The question is whether the Complaint provided adequate notice which fairly apprised Halvonik that he was charged with "willful" misconduct.  The Court holds that the Complaint did satisfy due process by sufficiently apprising Halvonik of the charges against him.

Contrary to Halvonik's contentions, the Complaint did allege willful conduct.  Courts have generally defined willful conduct, under 5 U.S.C. § 558(c), in two ways: (A) "[i]f the violator (1) intentionally does an act which is prohibited, irrespective of evil motive or reliance on erroneous advice, or 2) acts with careless disregard of statutory requirements, the violation is willful;"[18] and (B) "an intentional misdeed or such gross neglect of a known duty as to be the equivalent thereof."[19]   Cf. Bryan v. United

---

[18]Potato Sale Co. v. U.S. Dep't of Agric., 92 F.3d 800, 805 (9th Cir. 1996); Am. Fruit Purveyors, Inc. v. United States, 630 F.2d 370, 373 (5th Cir. 1991); Koden, 564 F.2d at 234, George Steinberg & Son, Inc. v. Butz, 491 F.2d 988, 994 (2d Cir. 1971); see also Cox v. U.S. Dep't of Agric., 925 F.2d 1102, 1105 (8th Cir. 1991) ("willful" includes "intent to do a prohibited act but also careless disregard of statutory requirements.").  The court in Cox further held that in suspension proceedings, only one of the alleged acts need to be willful to satisfy 5 U.S.C. § 558(c). Cox, 925 F.2d at 1105.

[19]Hodgins v. United States Dep't of Agric., 2000 U.S. App. LEXIS 29892 (6th Cir. 2000); Capital Produce Co. v. United States, 930 F.2d 1077, 1079 (4th Cir. 1991); Capitol Packing v. United States, 350 F.2d 67, 78-79 (10th Cir. 1965).  The Initial and Final Decision each cited, and justified their conclusions, on both standards of willfulness.

States, 524 U.S. 184, 196-97 (1998) ("While some courts had stated that willfulness . . . [is] a disregard of a known legal obligation, willful was also interpreted variously to refer to 'purposeful, intentional conduct,' 'indifference to the requirements of the law,' or merely a 'conscious, intentional, deliberate, voluntary decision.'") (citations omitted); Butz v. Gloveer Livestock Comm'n Co., 411 U.S. 182, 187 n.5 (1973) ("'Willfully' could refer to either intentional conduct or conduct that was merely careless or negligent."). Despite the division among courts over the statutory definition of "willful," the Supreme Court noted in Bryan v. United States that, at the very least, there is support for "the notion that disregard of a known legal obligation is sufficient to establish a willful violation." Bryan v. United States, 524 U.S. 184, 197 (1998). Given that the Complaint charged Halvonik with (a) "knowingly" disregarding PTO Disciplinary Rules and (b) violating his legal obligation to his clients and the PTO, he was charged with misconduct which, at the least, met the minimum requirements of "willfulness." Therefore, the Complaint sufficiently alleged "willful" misconduct. Alternatively, the conduct described in the Complaint clearly established a pattern of conduct that meets both tests for "willful" misconduct. See infra at § III.

    The fact that the Complaint did not specifically employ the word "willful" is inconsequential. Cf. Javits v. Stevens, 382 F.

Supp. 131, 139 (S.D.N.Y. 1974) ("Listing the canons, however, would have added nothing to the petition, for the facts alleged gave decedent ample and specific notice of the charges against him."). Even a criminal indictment is sufficient if it "first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions of the same offense." Hamling v. United States, 418 U.S. 87, 117 (1974); see also United States v. McKie, 831 F.2d 819, 821 (8th Cir. 1987); 1 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 125 at 569-71 (3rd. 2004) ("The elements need not be alleged in terms, and a pleading is good if it fairly imports knowledge, intent, or malice where these are elements of the crime."). Furthermore, insufficiency of a complaint for attorney misconduct must be prejudicial to bar suspension thereunder. Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio, 471 U.S. 626, 655 n.18 (1985); cf. Hagner v. United States, 285 U.S. 427, 431 (1932). The Complaint alleged instances of misconduct in detail, the provisions of the disciplinary rules Halvonik was accused of violating, and that he knowingly disregarded these rules.[20] See Compl., PTO 00007 (p. 1). This sufficiently alerted

---

[20]Because the Complaint adequately informed Halvonik that his conduct was done "knowingly," the Court need not consider whether the presumption that lawyers know the law, see Zauderer, 471 U.S. at 666 n.9 (Brennan, J., concurring in part and dissenting in part), Pyramid Controls Inc. v. Siemens Indus.

Halvonik to the mental state required to sustain the charges against him.  Moreover, any defense predicated on ignorance of the law is inconsistent with the right Plaintiff is attempting to vindicate in this case – the right to advise other people on the law.[21]

## 2. The ALJ Did Not Impermissibly Append Charges

Halvonik also argues that the ALJ found him guilty of a charge not appearing in the Complaint.  In the Initial Decision, the ALJ found Halvonik guilty of "neglectfully fail[ing] to timely follow-up and review the PTO files as Nelson requested to determine if the file contained the draft rather than final copy of the application and/or make any necessary corrections."  Initial Decision, PTO 00973, PTO 01041.  Although admitting that this was "not specifically noticed as neglect in the Complaint," id., the ALJ justified this finding on the grounds that the Complaint did accuse Halvonik of committing "gross misconduct" and "neglect" in "all

_____

Automation, Inc., 172 F.3d 516, 519-20 (7th Cir. 1999) ("All lawyers are presumed to know the law, and if they don't know a specific area of law well, they are obligated to consult with other lawyers who do."), Marinangeli v. Lehman, 32 F. Supp. 2d 1, 7 (D.D.C. 1998), would be sufficient in absence of a specific pleading thereof.

[21]Halvonik also raised an objection that because the Complaint did not allege willful misconduct, the Committee did not approve this charge. To the extent that this objection has not been addressed, this argument was not raised below and is therefore waived.

aspects of Nelson's patent application," id.; see also Compli. PTO 00007, PTO 00014 (p. 8) at ¶ 50(a).  Halvonik claims that it was not proper for the ALJ to find him guilty of charges "not specifically" noticed in the Complaint, and accordingly, asserts that this charge must be dismissed because the ALJ's conduct:  (a) deprived him of due process of law and (b) violated the PTO's rules by allowing an attorney to be sanctioned for conduct that was not properly charged under 37 C.F.R. § 10.137.  The gravamen of this part of Halvonik's challenge is whether a proposition that is not specifically rehearsed in the Complaint, but falls within the ambit of the general charges, constitutes a "new charge" that prejudiced the defendant.

The Court finds that the Compliant did sufficiently place Halvonik on notice of this charge and that this was not a new charge within the meaning of the PTO's regulations.  The Complaint alleged that Halvonik filed the "incorrect and incomplete revised application constitut[ing] neglect of a legal matter entrusted to him and failure to act competently in violation of 37 C.F.R. § 10.77(c)."  Complaint, PTO 00007, PTO 00015 (p. 9) at ¶ 50(c).  Contrary to Halvonik's argument, a lawyer's duty to file an application on behalf of a client does not necessarily end the second an application is filed.  Moreover, to the extent that there may have been an ambiguity in the coverage of this charge, the PTO early in its pre-trial briefs put Halvonik on notice, before the

hearing, that it interpreted matters relating to Halvonik's failure

to follow-up on the application to be within the scope of the

Complaint.  Director's Pre-Trial Brief, PTO 00647, PTO 0647-50.

Given a) that this charge fell within the scope of the Complaint,

b) that the PTO clarified, before the hearing, that the charge was

included within the Complaint, and c) that Halvonik has failed to

allege any prejudice, the Court finds this argument unavailing.


**III. The PTO Properly Found Halvonik Guilty of Violating its Disciplinary Rules**

Halvonik also challenges the PTO's finding that he violated

any of its disciplinary rules and further asserts that the ALJ's

decision is unsupported by substantial evidence.[22]


**1. The PTO's Rules Proscribed Halvonik's Conduct in Failing to Properly File Nelson's Application**

The first charge against Halvonik stems from his failure to

file Nelson's application in accordance with the intentions of his

client and for filing the application with errors and omissions.

In connection with this charge, the ALJ found that "[a]s a result

---

[22]Halvonik for the first time objects in his concluding
brief to the ALJ's additional findings regarding the neglect of a
legal duty charge in failing to follow up on the application,
claiming that the ALJ's decision was also unsupported by
substantial evidence.  It is entirely inappropriate to raise
arguments for the first time in a concluding brief.
Accordingly, the Court deems that this argument is waived.

of this lack of follow-through and failure to carefully scrutinize that which he was about to file, Respondent filed an application which did not conform to the inventor's intentions, which had been clearly expressed to him on several occasions . . . ." Initial Decision, PTO 00973 at PTO 01040 (p. 60). Moreover, Halvonik had "several bites at the apple . . . . [As Halvonik admitted], he did not even closely review what he was about to file . . . [for had] he reviewed it with any degree of prudent scrutiny, as he himself admitted, he would have seen the blanks for the dimensions which would have kept him from filing the draft." Id. Last, the ALJ found Halvonik had not acted intentionally in misfiling the application but "as a result of gross negligence." Id. Therefore, the ALJ found Halvonik guilty of willfully committing "disreputable or gross misconduct" and "conduct that adversely reflects on the practitioner's fitness to practice before the Office." Id. The Commissioner affirmed the reasoning of the ALJ. Final Decision, PTO 02568, PTO 02585 (p. 18). Halvonik does not deny the factual predicates for this finding. See, e.g., Pl.'s Reply Br. at 9 (Halvonik "in fact did not make those changes requested by the inventor and that is what he was charged with."). Rather, Halvonik asserts that this conduct does not constitute a violation of the disciplinary rules because: (a) there is no rule that an attorney must make every change requested by a client, Pl.'s Reply Br. at 9, and (b) the defects were not fatal because he could have amended

the application later, i.e., the errors were harmless or caused <u>de</u> <u>minimus</u> harm, Pl.'s Reply Br. at 14.   The Court is unconvinced.

Regarding Halvonik's first contention, even assuming that Halvonik is correct that an attorney is not required to adopt every revision requested by the client, this would not excuse Halvonik's conduct in this case.[23]   Not only did Halvonik promise Nelson he would make the agreed upon changes (inducing Nelson to sign the patent application on the basis of this promise), but his failure to make the changes, and follow PTO rules regarding the signing of final declarations,[24] resulted in the submission of a deficient patent application,[25] <u>Initial Decision</u>, PTO 00973, PTO 01040 (p.

_____

[23]One could argue that if Halvonik had chosen not to include changes for tactical reasons, e.g., because the changes were unnecessary or might impair the application, his conduct might not have been inappropriate.   <u>Cf.</u> 37 C.F.R. § 10.84(b)(3) ("In representation of a client, a practitioner may: (1) Where permissible, exercise professional judgment to waive or fail to assert a right or position of the client.").   But these are not the facts here.   Rather, the revisions at issue here were actually necessary to secure the inventor's intent and effectuate a proper application.

[24]The ALJ characterized Halvonik's request as "a short cut that essentially circumvented the standard [used] by the patent application process."   <u>Initial Decision</u>, PTO 00973, PTO 01038 (p. 58).

[25]The defects included: (1) using the term "sealant," rather than "adhesive"; (2) the preferred dimension of the molding strip contained blank areas for the numerical dimensions to be inserted; and (3) the draft contained an incorrect sentence stating that the foam dam would be removed after the urethane had cured.   <u>Final Decision</u>, PTO 02568, PTO 02570 (p. 3);   <u>Initial Decision</u>, PTO 00973, PTO 01056 (p. 76) at ¶ 7.

60).   The ALJ found that, but for Halvonik's negligence, the

defects would not have occurred, Initial Decision, PTO 00973, PTO

01040 (p. 60), and that at least one of these deficiencies raised

the possibility of "potential litigation,"  Findings of Fact in

Initial Decision, PTO 00973, PTO 01060 (p. 81) at ¶ 41.   Even

Halvonik admitted that "he screwed up."  Id. at PTO 01060 (p. 80)

at ¶ 35.   Therefore, Halvonik's defense is clearly misplaced.

That any deficiencies could have been remedied later is at

best a debatable point.  See, id. at PTO 01060 (p. 80) ¶¶ 36-40.[26]

Even Halvonik's own expert witness testified that Halvonik could

not have amended all the errors in the application.  See Pl.'s

Resp. Br. at 8-9 ("The ALJ's mistaken conclusion was formed by the

mistaken impression of both experts and [Halvonik] himself who were

---

[26]The Court further notes that the Supreme Court's opinion
in Kingsland v. Dorsey, 338 U.S. 318, 319 (1949) indicates that
PTO disciplinary rules are not meant exclusively to punish
conduct that has caused harm, but to deter improper conduct so as
to create a competent and diligent Bar to assist the public in a
very technical area of the law.  Consequently, even if the there
was no harm, the conduct was still improper, giving the PTO
sufficient justification to sanction such conduct.  Cf. In re
Disciplinary Proceedings against Kelsay, 455 N.W.2d 871, 872
(Wis. 1990)("Discipline for lawyer misconduct is not intended as
punishment for wrongdoing; it is for the protection of the
public, the courts and the legal profession from further
misconduct by the offending attorney, to deter other attorneys
from engaging in similar misconduct and to foster the attorney's
rehabilitation.").  This is especially true where an attorney
represents one time inventors with little patent experience such
that other checks may not adequately deter misconduct and clients
may not recognize when his or her attorney has acted improperly.
Cf. STANDARDS FOR IMPOSING LAWYER SANCTIONS § 9.22 (2003) ("Factors
which may be considered in aggravation . . . (h) vulnerability of
victim.").

under the impression that changes to the patent application were prohibited after signing the declaration"); Def.'s Reply Br. at 10 (collecting citations to the record).  Undaunted by his own expert's opinion, Halvonik asserts that he could have made revisions even after the application's submission to the PTO.  See Pl.'s Resp. Br. at 8-9.  To the extent that this argument could have merit, in light of the fact that, had Halvonik exercised due care and honored his representation to his client, this shroud of uncertainty would not have occurred, the ALJ properly found him guilty of acts of misconduct.  An attorney who needlessly (and in this case negligently) increases risk to his client's interest, when the client himself has not invited this risk,[27] clearly commits misconduct.  Cf. In re Moore, 177 F. Supp. 2d 197, 200 (S.D.N.Y. 2001); Standards for Imposing Lawyer Sanctions § 4.42 (2003) ("Lack of Diligence . . . 4.42 Suspension is generally appropriate when: (a) a lawyer knowingly fails to perform services for a client and causes injury or potential injury to a client, or (b) a lawyer engages in a pattern of neglect and causes injury or potential injury to a client.") (emphasis added).  Moreover, although Halvonik admittedly prejudiced Nelson's application, it does not appear that Halvonik made any attempt to rectify these problems, see supra at II.2; therefore (and moreover), any remedial measures

---

[27]The ALJ found that Nelson had not put "a significant degree of pressure on Halvonik" to justify the misfiling of his application.  Initial Decision, PTO 00973, PTO 01040 (p. 60)

Halvonik may have taken later would still have delayed the successful completion of Nelson's application.  Accordingly, Halvonik's defenses to these charges cannot be sustained.[28]

Halvonik further contends that his conduct cannot be considered gross misconduct because he did not intend to be negligent and was unaware that he was committing errors.  However, the ALJ found that the cause of Halvonik's neglect was that he was an inexperienced practitioner who took on more work than was reasonable under the circumstances.  Initial Decision, PTO 00973, PTO 01040-41.  That Halvonik structured his practice in a manner where such mistakes would naturally occur is sufficient to overcome any objection that Halvonik did not intend to make mistakes.  See, e.g., In re Solerwitz, 848 F.2d 1573, 1580 (Fed. Cir. 1988); In re Gubbins, 890 F.2d 30, 31 (7th Cir. 1989); In re Harte, 701 F.2d 62, 62 (7th Cir. 1983) ("The problem of court delay is due in part to the reluctance of lawyers to relinquish business to other lawyers.  Such reluctance while natural is unprofessional and deserves censure."); In re Bithoney, 486 F.2d 319, 323 (1st Cir. 1973)

---

[28]Halvonik also alleges that the ALJ did not find him guilty of willfully committing the acts which gave rise to the charge.  The ALJ stated: "I do not find that Respondent willfully intended to file the draft as Nelson's final application but that he did so as a result of his gross negligence."  Initial Decision, PTO 00973, PTO 01041 (p. 61).  Although one could read this passage as suggesting that the ALJ did not find that Halvonik willfully committed gross misconduct, it is also a reasonable reading that he did.  The fact that the ALJ sustained the charge, Conclusions of Law in Initial Decision, PTO 00973, PTO 01067-68 (pp. 87-88) at ¶ 8, is conclusive proof confirming this latter reading.

(physical infirmity did not excuse attorney's conduct because attorney did not take meaningful steps to secure the clients' interests). This concern is underscored in this case by Halvonik's failure to honor his client's repeated requests, and the fact that, had he exercised "any degree of prudent scrutiny," he would not have filed the wrong version of the application. Initial Decision, PTO 00973, PTO 01040 (p. 60); cf. In re Brandt, 27 U.S.P.Q.2d 1749, 1749 (Comm'r Pat & Trademarks Sept. 10, 1992). Moreover, the ALJ properly found that Halvonik's conduct demonstrated gross negligence and careless disregard for his duties to his client, and, therefore, that Halvonik's actions were willful.

## 2. Halvonik's Actions in Failing to Remunerate Palmer for the $500 is a violation of the PTO's Rule

The PTO found that Halvonik "engaged in gross misconduct," engaged in "conduct that adversely reflects on the practitioner's fitness to practice before the Office," and failed to "[p]romptly pay or deliver to the client as requested by a client the funds, securities, or other properties in the possession of the practitioner which the client is entitled to receive"[29] for his failure to return $500 of Palmer's advance payment for the services which he did not tender. Halvonik admits that Palmer requested a refund and that he tendered a check for $500 payable on condition

---

[29] 37 C.F.R. § 10.112(c)(4) (emphasis added).

that this satisfy any claim she had against him for the "unearned" fee she had already paid.  However, Halvonik avers that Palmer is not "entitled" to this $500 within meaning of the PTO's Disciplinary Rules.  Rather, he asserts that a fee dispute exists and, until resolved, she is not entitled to any refund.

In cases where there exists a fee dispute between a PTO practitioner and his client, neither party can be "entitled" to the money so long as a <u>bona fide</u>[30] fee dispute exists.  Consequently, the gravamen of this issue centers on whether a <u>bona fide</u> dispute existed.

In this case, the analysis is easy because Halvonik admitted that he owed Palmer (at least) $500.00.  <u>See</u> <u>Halvonik Transcript</u>, PTO 02121, 02202-03 (pp. 1294-95).  Halvonik does not dispute the admission or the weight the ALJ places upon it.[31]  Rather, Halvonik

---

[30]As with any fiduciary relationship, a practitioner has a duty of utmost good-faith and loyalty to his or her client.  If the practitioner denied the return of clients' funds solely for purposes of harassment or recalcitrance, such conduct would certainly violate this principle.  <u>Cf.</u> 37 C.F.R. § 10.84 ("(a) A practitioner shall not intentionally . . . (3) Prejudice or damage a client during the course of a professional relationship, except as required under this part.").

[31]At oral argument, the Court expressed concern that the ALJ had improperly used a settlement offer as an admission of guilt.  Halvonik assured the Court that he waived any such argument in his trial before the ALJ because he wanted "all the information to come in."  Oral Arg. Tr., 1:11:25-1:11:35, May 2, 2005.  Consequently, because Halvonik waived this argument as part of his litigation position before the PTO, he may assert no claim here regarding the impropriety of the inculpatory use of an alleged settlement agreement.

contends that because the fee agreement required a flat-fee for services, the disputed $500.00 cannot be considered "client funds." Whatever merit this argument has, it does not help Halvonik. Halvonik is charged, in addition to impermissibly retaining client funds, with engaging in "gross misconduct," and "conduct that adversely reflects on the practitioner's fitness to practice before the Office."  Erroneously retaining money that one knows is owed to a client is a breach of fiduciary duties and would be tantamount to forcing litigation on a matter to which a lawyer would have only a frivolous defense.   This would clearly constitute "gross misconduct," and "conduct that adversely reflects on the practitioner's fitness to practice before the Office."  The PTO's disciplinary rules are sufficiently broad to recognize the principle that attorneys should not be allowed to defeat the spirit of the law by their claimed technical adherence to its letter. Cf. Zauderer, 471 U.S. at 666 (Brennan, J. concurring in part and dissenting in part).

The ALJ also found Halvonik's conduct willful for canceling the check he tendered to Palmer.  As Halvonik has admitted, he had no claim to the $500.00, and therefore had no right to attach any terms or conditions on acceptance.   Moreover, Halvonik made no effort to resolve the fee dispute even though the onus is clearly on the lawyer to set in motion appropriate means for resolving such disputes.  See e.g., Pa. R. P. C. 1.15 (Comments) ("The disputed

portion of funds should be placed in trust and the lawyer should suggest means for prompt resolution of the dispute, such as arbitration.  The undisputed portion of the funds shall be promptly distributed.").  Instead, as the ALJ observed, Halvonik "clearly had a practice of retaining funds that even he knew should be returned to his clients, but that he only returned when faced with PTO pressure."  <u>Initial Decision</u>, PTO 00973, PTO 01052 (p. 72).  Consequently, Halvonik's conduct rises to the level of willful.

### 3. Halvonik's Failure to Return Palmer's Disclosure Materials

The ALJ also found that Halvonik engaged in "conduct that adversely reflects on the practitioner's fitness to practice before the Office" and failed to "[p]romptly pay or deliver to the client as requested by a client . . . other properties in the possession of the practitioner which the client is entitled to receive" for his failure to return Palmer's disclosure materials.  Halvonik admits to the facts relevant to this finding but nevertheless pleads for the Court to reverse the ALJ's Decision because, as a matter of law, the property was of <u>de minimus</u> value and therefore his conduct did not violate the Disciplinary Rules.[32]

---

[32]Halvonik also asserts that he sent Palmer what he thought she had requested.  Pl.'s Br. at 40.  Halvonik's argument misses the point.  Palmer requested her disclosure materials back.  The ALJ found that Halvonik did not refuse to return the materials out of malice, but because he was disorganized, i.e., had he exercised care in his practice of law he would have known what materials she had sent him and returned all of them to her.

The Court is unconvinced that the alleged minimal value of the property exonerates Halvonik's conduct.  This factor may have some weight in determining the proper sanction but it does not negate the fact that Halvonik did in fact violate the letter, and the spirit, of the disciplinary rules.  Cf. Republic of the Philippines v. Westinghouse Elec. Corp., 43 F.3d 65, 74 (3rd Cir. 1994) ("Obviously, a pattern of wrongdoing may require a stiffer sanction than an isolated incident; a grave wrongdoing may compel a more severe sanction than might a minor infraction; and wrongdoing that actually prejudices the wrongdoer's opponent or hinders the administration of justice may demand a stronger response than wrongdoing that, through good fortune or diligence of Court or counsel, fails to achieve its untoward object.").  Moreover, whereas the disclosure materials may have minimal value to Halvonik, they are most likely valuable and important to the inventor.[33]

## CONCLUSION

For the reasons set forth above, the Court affirms the PTO's Decision.  Accordingly, the Respondent's Motion of Summary Judgment is **granted** and the Petitioner's Motion of Summary Judgment is **denied.**  Judgment will be entered accordingly.

---

Initial Decision, PTO 00973, 01053 (p. 73).

[33]To the extent Halvonik has raised any other claims, the Court has considered those arguments and finds them unmeritorious or improperly raised.

```
                              _____/s/_____
                              DONALD C. POGUE
                              UNITED STATES DISTRICT JUDGE[34]
```

August 8, 2005

_____

[34]The Honorable Donald C. Pogue, Judge for the United States
Court of International Trade, sitting by designation.

No. 99-863                                          Page 38